May it please the Court, Judge Trott, my name is Leigh Boyd, I'm appearing on behalf of the appellants. I would like to reserve 5 minutes of my 20 minutes for rebuttal. Members of the Court, the District Court erred in dismissing the appellants' claims on political question doctrine for two overarching reasons that I'll be arguing today. First, the District Court erred by not considering, by ignoring the history of judicial resolution of these types of Holocaust restitution claims. That has been in cooperation with and encouraged by both political branches. Secondly, the District Court erred when finding there were no judicially manageable standards for this case. By failing to consider the absence of any evidence of a foreign policy decision or government interest that would have to be reviewed or second guessed in adjudicating these claims. The type of evidence that is usually found in executive orders, executive agreements, or even intervention formally or informally into the case through a statement of interest or an amicus brief. The silence on behalf of the political branches as to their interest is deafening in this case. Accordingly, the District Court erred in not construing narrowly the doctrine as required by Ninth Circuit and Supreme Court precedent in favor of exercising their Article III subject matter jurisdiction. According to the Supreme Court in the Alfred Dunhill case, where the State Department has no position, unless constrained by established policy, the courts can best discharge their responsibility by enforcement of regular judicial processes. We ask that that be allowed in this case and that it be remanded for subject matter jurisdiction to be exercised by the District Court. In your brief, you took a more affirmative or aggressive position, and you said that the political branches had actually endorsed the court's resolution of Holocaust-related claims. What do you point to for that statement? We hold to the endorsement argument, and we point to several pieces of evidence, beginning with the Tate letter by the legal assistant to the Secretary of State, mentioned in footnote 14 of our brief, that was referred to again by this court in the Altman v. Osterer case that's been affirmed, that sets forth the policy of the State Department that all obstacles should be removed for the court's hearing Holocaust restitution claims. The history then was somewhat... But the statement in the Tate letter doesn't absolve us of our responsibility to look at the justiciability question. It doesn't... It's not an endorsement that the courts have the jurisdiction. It's something different. It's if it is in the courts, then it should move forward. Isn't that what the Tate letter says? The Tate letter... Yes, Your Honor, and I understand. I hear your concern. The Tate letter is addressing the removal of obstacles to applying the rule of law in the courts, and the courts exercising their Article III jurisdiction to aid in the compensation and the full recovery by these victims. There is more evidence. We have in the record the Tate letter. We began looking at these claims, again, when they were first filed in the 1990s in the Swiss Banks litigation. The Eisenstadt Coalition, Stuart Eisenstadt being appointed by the President at that time, President Clinton, especially to investigate the Holocaust issues. His report has stated in more than one instance that the class actions were the catalyst for any recovery or executive negotiations that helped in this effort to compensate victims. I can refer you to the case of the German defendants where his affidavit in that case specifically references the class action lawyers and the class action suits being the catalyst for negotiations between governments, even commencing in the first place. Moreover, there has been continued State Department encouragement of full compensation and the application of the rule of law. There has been no evidence from the State Department or the political branches that these claims should be exclusively reserved to government-espoused claims. Indeed, cases have continued in the courts and have been affirmed in the Austria v. Altman case, the Altman case of the Supreme Court this summer. There are Holocaust restitution claims. The cases of the Swiss Banks are continuing to be litigated through settlement procedures in the Eastern District of New York. Moreover, claims are being administered from the courts in the French Banks cases that were heard in the Eastern District of New York and litigated. In none of those cases was the fact that the State Department was in negotiations to mediate settlement between the parties. Never did that fact cut against judicial resolution. Never was there a statement by the government that we would have exclusive, the State Department would take exclusive remedies for the Holocaust victims that have been, had their property expropriated and plundered as has been alleged in our complaint. We don't, you know, one of the difficulties is we don't have any absolutely clear guidance other than going back, of course, to Baker v. Carr and some of the others. But we do have just a year ago from the United States Supreme Court, the Garamendi case, and there's a statement that the court makes in Garamendi basically saying that the aftermath of these was a treaty-making process to resolve that. It seemed to me that at least five members of the Supreme Court were pointing us to the political question issue with that statement. I mean, do you disagree? Is there anything different than Garamendi out of the Supreme Court that we should be looking at? Yes, Your Honor. With all due respect, the case was a preemption case and the Executive Department's powers as compared to the judiciary powers was not an issue. It was, the language in Garamendi was specifically addressing that the federal government was responsible for foreign relations and should not be compromised by the state's intervention into federal affairs, into foreign affairs. That language cannot be grafted into the political question doctrine which addresses the separation of powers. That would be my first point. My second point is this. In that case, there were specific executive agreements between the State Department, our government, and the governments of Germany, France, and Austria that established a policy that must be applied in those cases. And the California statute in Garamendi was found to compromise that policy. In this case, we have no evidence of a policy from the government that would be adjudicated as unwise, that would be second guessed. In this case, when the court applies the standards available to it to resolve expropriation claims. As I understand it, invitations have been made to the federal government for intervention here, have they not? Yes, Your Honor. I have. What has been the response to those? The response has been that the decision is not to intervene formally in the case at this time. I was asked not to argue one way or the other on the merits of the case as regarding that decision. I was asked to inform the State Department of this hearing. I have not been notified that they're here, but I did do that. So the State Department has spoken to me personally that they were aware that the case was in the Northern District, was aware of the case, and that it had been dismissed. We believe it is significant that they have not exercised their right to intervene through a statement of interest, which has been done repeatedly when they feel their government interests, their State Department and executive interests are at risk. That's an argument that has a fair amount of facial appeal, actually. The one question I have is that if we were to take it at face value, you basically would be dictating executive branch action because they would then have to come in one way or the other on every case that's filed and basically be kind of some super monitoring power over all these potential foreign relations cases. And it seems to me that the public policy and actual consequence of your position would really put the State Department in a bind of basically being a monitor of the literally hundreds of cases that get filed around the country. I understand your concern, and that was expressed in the dissent of the Garamundi case, where the majority had specifically referenced the statement of interest power that the government has and had stated that as a matter of the preemption doctrine analysis, that that interest should be considered by the court. And the dissent argued that that was giving really too much power for the policy to dictate the subject matter jurisdiction issue. However, what the court stated in Garamundi was that deference is appropriate in these types of matters. Where there is a clearly established policy placed in evidence in the case, we have no clearly established policy beyond the history of the collaboration and cooperative effort between the political branches, and I'd like to address the Congress also, but specifically with the efforts of both administrations through Stuart Eisenstat being appointed and Holocaust issues to mediate settlement, as well as continuing on in the envoy for Holocaust issues. Let me interrupt you for one second. You keep referring to Secretary Eisenstat. To what extent are his views somehow persuasive in the resolution of this issue? You seem to cite him for the proposition that he's an authority on this question, he was a State Department person, and he seemed to endorse the idea that a class action is helpful to the resolution of these issues. Is that right? I am arguing that point, Your Honor. If you look in his memoirs, however, he makes somewhat disparaging remarks about the class action attorneys. I'm sure you've probably seen this. Any hope of containing the controversy by quiet diplomacy and the Volcker audits ended when a group of class action lawyers got wind of the D'Amato hearings. The lawyers hijacked the Swiss bank disputes, and then Chief of Staff said you'll need to force me physically into a meeting with class action lawyers. I once again explained why there was no choice but to deal with the lawyers. The U.S. government cannot snap his fingers and make the lawsuits disappear. So if you take a look at that small snippet, it suggests at the very least that he's conflicted about the involvement of class action lawyers in the resolution of these international issues. With all due respect, Judge Trott... I have to say that all the time. Go ahead. Just tell me I'm wrong. You have to have it, but you don't have to say it. Exactly right. Go ahead. As a blanket matter, I have all due respect for the court, so I will not say it from now on. Eisenstadt has... Stuart Eisenstadt has been the voice, both written and oral, of the State Department, being that we have no evidence presented in this case, has been the voice of the policy that is commensurate with judicial resolution of these claims. Not only did he broker a settlement with the parties, regardless of his difficulties, personal difficulties, in dealing with lawyers, which I think most people could understand, he did continue not only to broker a settlement in the Swiss banks case, and I have a quote I'd like to read also from his memoirs regarding dealing with the lawyers and the cases, but went on to broker a settlement with the German defendants that included settling claims on behalf of plaintiffs whose claims had been dismissed by the District of New Jersey on political question doctrine in the Iwanoa and Degusa cases, the Berger-Fisher cases, that have been used by the District Court below in justifying her opinion, which... And some of these cases came about to the courts because there were settlements brokered and then they basically were confirming settlements, were they not? They weren't, in effect, originally filed cases that went through on the merits, but a number of these cases, like the one you're referring to now, where Stuart Eisenstadt's trying to help with the settlement, they really exist outside the court system until such time as they want to enforce the settlement. Isn't that true? I would disagree that they exist outside the court system because there has been ample judicial review of the settlement, the fairness, the class action definition, the claims that were appropriate under those settlement agreements. There has been, in the German defendants litigation, a long opinion regarding the parties, the claims that the parties are bringing. Was the German defendants litigation one that rested on a contract or some other document? The German defendants litigation was different in one sense. The only way that there could be a settlement amongst the parties, the litigants, was if the federal government, through Stuart Eisenstadt's effort, agreed to submit statements of interest in all cases dealing with these after the settlement, that it was in the foreign policy interest to have those claims barred. But even in that agreement, that executive agreement between Germany and the United States that came out of the settlement, it stated that it should not be used as an independent basis for dismissing the claims, that these claims would continue to be reviewed by courts who must consider whether the claims were barred by the terms of those agreements. When there is a rule of decision, such as an executive agreement, courts must consider that. And that is where the court below erred when she used these cases of E. Winoa and Berger-Fisher. Because in those cases, there were postwar Germany agreements that should have been interpreted as to barring the claims or not. Are you going to go to the second point? Exactly my question. The second point. They're both equally important, and we've taken up a lot of your time. One quote in response to Judge Trott. It's quick. From Stuart Eizenstat's memoir, Imperfect Justice, regarding his settlement negotiations. Even if we had a willing partner, it is doubtful we could have imposed a government-to-government settlement on the parties. The United States so prides itself on the access its citizens have to the courts to handle a myriad of complaints other societies handle outside the judicial system. Wrong too. A lack of judicially discoverable and manageable standards for resolving it. The district court took a look at this and said this is simply beyond the capacity of a district court to cope with. On page 13 of the court's opinion, I'm sure you've read it. Plaintiffs do not seek recovery of money and assets withheld from specific accounts, but rather the undetermined value of property stolen in untold ways in a multiplicity of billions. Plaintiffs' claims require this court to resolve the completing rights to the Ustasha treasury of potentially hundreds of thousands of citizens of various nations. Funds as to which any number of persons harmed by the regime, both represented and not, might equally assert a claim. You know, the district court, in street terms, is throwing up its hands and saying, this is gigantic, and it's ancient, and there's no way that a court has the capacity to handle this. Your answer? The district court got the political question standard wrong by equating manageability of the factual issues with whether there are manageable judicial standards to apply to the issues before the court. Where the claims brought do not require a second guessing of a political policy decision, there are manageable standards. In other words, in resolving the expropriation claims, the claims for conversion and unjust enrichment and restitution, there need be no review of any decision made by the executive branches. Like the cases at the Ninth Circuit as hell where there was a political question, and there's only two, maybe three out of the ten or eleven cited by us, there has been a direct requirement in the remedy issued by the court that the political branches do or not do something. That would be a case where there are no judicial standards, legal standards. Dealing with complex cases, dealing with complex facts, is something courts do every day. So what you're saying is that the issue that the district court jumped to is really more a down-the-road issue of potential class certification and that the political question issue is really whether there would be politically implicated standards in order to have to resolve the case. Exactly. So it's a legal, you're saying the district court made a legal misjudgment in interpreting that part of the standard. Yes, Your Honor. The manageable standards analysis does not look to the massive amounts of evidence that must be reviewed by the court, which happens particularly since class action litigation. What does it look to in this context? It looks to whether there is evidence of a foreign policy decision that must be second guessed by the court when adjudicating the elements of the claims and issuing judicial remedies. Here, there will not be any foreign policy decision that is at risk of being reviewed by the court when issuing compensation and full accounting, which has been requested by the State Department of the Vatican Bank's involvement in expropriating and converting and continuing to profit from the funds from the state. Can I go back on this? I don't think I had focused as closely as you have on how you interpret the second prong of Baker about the discoverable and manageable standards. If you could just point me to where the courts have discussed the interpretation that you prefer, which is quite different from what the district court viewed it as. Yes, Your Honor. The district court did not consider the Ninth Circuit precedent, which focuses on whether or not there will be a challenge to the wisdom of any government act or decision. I'm quoting from Northrop Corp.'s case, 1983, before the Ninth Circuit. I am also looking at the language out of the Cooey case. The nature of the inquiry must be analyzed discriminatingly. Is it one that is familiar to the courts? Expropriation of funds and complex banking cases are familiar to the courts, and we have ample standards, the federal courts, the district courts, in managing complex cases. I continue on. No Gwinn case, in which there was considered to be a political question because the decisions of the national defense policy must be reviewed in order to issue judicial remedy that the plaintiffs were asking for, which was to redo defense standards for Air Force environmental assessment. The language that the court has used over and over is the nature of the inquiry. Is it one that is familiar to the courts? Well, what about the Calvary case? And this is one that the district court relied on. The courts have repeatedly recognized that they are ill-equipped to adjudicate class actions based on the kinds of claims presented here, and that such claims are the province of the political branches. And Calvary is a D.C. Circuit case that talks about the span between the doing of the damage and the application of the claim. The assuagement is too vague. The time is too long. The identity of the tortfeasor is too indefinite. The procedures sought adjudication of some 200,000 claims for multifarious damages inflicted 20 to 30 years ago in a European area by a government then in power is too complicated, too costly to justify undertaking by a court without legislative provisions and means thereby to proceed. I mean, isn't that pretty much what the district court said we have here? Yes, the district court did. It's Calvary and wrong in dealing with the second prong of Baker v. Carr in that regard. Are you telling us district judges have gotten better since 40 years ago? Is that the message you're giving us? Yes, Your Honor. Since 1966, the district courts have now 40 years of managing class action cases. The Rule 23 was adopted that year. Courts had no experience with managing complex cases. We've had since then four revisions of the Manual for Complex Litigation that are given to our federal courts which give ample standards, allow for forensic experts and accounting issues, allow for special masters to be appointed, allow for administration of claims by administrators. These claims are susceptible to proof that this court has heard before in complex international litigation. At the time of Calvary, that was not the case. But the point is that Calvary interprets the language that you're talking about to allow these kinds of considerations to be put on the scale. And that's what the district court did here, put these kinds of issues on that scale under the second prong of Baker v. Carr. Yes, Your Honor. And that is out of step with Ninth Circuit precedent, the 1966. North River. I would allow that there are some, there is one prong of the judicial manageable standards analysis that looks at what I would consider a Rule 23 manageability. However, the primary inquiry as stated in all of the cases, political question cases, is whether or not there is any governmental decision or policy that must be reviewed. Courts don't have the standards for making policy decisions. Under prong two, you're saying that's what it's limited to? That seems to me to be prong four. Right. The court below used that analysis on the judicially manageable standards. To the extent that it goes to prong four, I would argue again that it does not. But I will address it since I hear a concern about manageability. Although I do believe that the district court could have the standards, which is the question of political question, to manage complex cases. And there is ample eviduation because we normally would review this political question de novo as a legal issue, and yet it seems to me that the kind of issues embedded in prong two are the kind that normally we would defer to the district court on. What's your thought on standard of review when we get to prong two as a part of the overall Baker v. Carr analysis? Prong two being the judicially manageable standards, yes. The prongs have changed somewhat since the Powell case. The de novo review, I do believe, asks the question whether or not the standard was applied correctly to the facts of this case. And in that sense, we can look to the allegations. The allegations do, as you say, cover historically a long span, as far as time, and even geographic space. However, the courts have the standards for dealing with international litigation. Indeed, under the Foreign Sovereign Immunities Act, which is one basis of our subject matter jurisdiction allegations, the courts have dealt with cases involving foreign sovereigns and their instrumentalities where discovery must ensue against those, and Congress has endorsed that in regards to Holocaust claims in the Altman case this summer. Accordingly, it was in the Supreme Court's mind this summer on remanding the Altman case that Holocaust claims would be reviewed, even given their long span in time and history. Well, a single piece of art Holocaust claim was what the case before the Supreme Court involved, correct? Yes. So it seemed to me that's, I found that it was probably difficult to draw much of anything from the Altman case because of they didn't address political question and it was one piece of art. But is there something in that case you think we ought to be looking to in support of your theory? Yes, Your Honor. In analyzing the textual commitment prong, the first prong of the Baker analysis, the history of the management of these types of claims must be analyzed. Congress has part in passing the Foreign Sovereign Immunities Act and giving to the court subject matter jurisdiction over foreign sovereigns and their instrumentalities engaged in commercial activity is part of that history of the three branches marching in tandem with the overall arching policy to compensate and apply the rule of law to the Holocaust victims against European governments, their banks, as well as private companies. In the district court's view of this case, it says plaintiff's claims require this court to resolve the competing rights to the treasury of potentially hundreds of thousands of citizens of various nations. Do you disagree with that? I disagree with that. In your complaint itself, you say this case is brought on behalf of the named plaintiffs and all Serbs, Jews and former Soviet Union citizens and their heirs and beneficiaries who suffered physical, monetary and or property losses, including slave labor due to systematic and brutal extermination of Jews, Serbs and Romani by the Ustasha as a result of the occupation of the former Soviet Union by Croatian military forces in concert with their German occupation forces. So you bring to the court all Serbs, Jews and former Soviet Union citizens and their heirs and beneficiaries who fall in this category. This strikes me as hundreds of thousands of people. What am I missing? If not more, if not millions. Judge Trott, that is an inquiry at the certification stage before the district court for the definition of the class itself. The allegations that are brought do not require, I believe the question was looking at the competing rights to the entire Ustasha treasury. It requires a look at what part of that treasury which can be traced to the plaintiffs is in the true, then that money must be compensated. The Ustasha treasury itself only needs to be reviewed in following the chain of evidence from the treasury to the portion... But you are asking for the resolution of the rights of hundreds of thousands, if not millions of people. All Serbs, Jews, everybody involved who might have been tangled up in this horrible mess in Europe for years. Which is exactly what is happening in the Swiss Bank case today where claims are being administered to Holocaust victims who are the victims of the bank's expropriation in Switzerland being administered by the Eastern District of New York. It is also happening in the French Bank's case before the Eastern District of New York that came out of Bodmer case that we cited. It is also being done in the Austrian Bank's case. There are manageable standards and precedential value that can be applied. And I see that my time was up, Your Honor. Eleven minutes ago, but we've actually detained you. We detained you, which is why you're there still. With all due respect, we've enjoyed grilling you. As a professor, I like being on the other side better, I think, but it has been enjoyable nevertheless. And if you're in real trouble, you can send it to Philadelphia where Charlie Weiner has cases despite the claimed unmanageability of that process. Yes, Judge Kater. The FSS litigation would be my answer to the Calberin case. Thank you. Thank you, counsel. We'll give you some time to respond. Thank you. And we'll hear from the other side. May it please the court. My name is Jeffrey Lina. I represent the Institute for Religious Works captioned in the complaint as the Vatican Bank. Your Honors, I think I'd like to begin today by there isn't a lot of time, so I'm just All right. Hit the points that Professor Boyd has raised, and I think the first point I'd like to start with is the last point she made, which related to the manageability issue and the nature of the complaint. It's correct to say that, by and large, these cases are disposed of, taking the allegations of the complaint as true. The allegations of this complaint do include allegations of atrocities and co-conspiracy in the commission of war crimes implicating a foreign sovereign. That's a position that the district court invited Professor Boyd to abandon at oral and she embraced it. That's on page 69 of oral argument, an oral argument, by the way, which went on for two and a half hours. I'd like to make that point in regard to the question of whether or not the district court took a careful look at this case and conducted a discriminating analysis. Not everything that appears in an opinion reflects all of the things that a district court judge necessarily considers. In this case, we had 150 pages of briefing, other submissions, and two and a half hours of oral argument. Perhaps I'm proceeding too quickly for the translator. Focus on your case. Okay. In this case- I don't understand that, frankly. Are you suggesting that somehow the process on review is to psychoanalyze what a district judge has done? I've written a lot of opinions and, you know, I try to be very careful in basing them on what I consider to be the relevant factors. So the idea of saying, well, something was dealt with in oral argument and the judge did this or did that really does not provide much manageability at the court of appeals level, does it? Well, I think, Your Honor, if the question before the court as it's framed here is whether or not a discriminating analysis was undertaken, and appellant's position is that not everything was considered. In order to uphold the district court's or look at the quality of the district court's opinion, it may be worthwhile to look at the full panoply of evidence that was considered by the district court. That understood. Let's try to pinpoint something that I'm thinking about. Professor Boyd says the district court made a mistake on prong two of Baker v. Carr by misinterpreting the phrase a lack of judicially discoverable and manageable standards for resolving it. And that infects the decision on that prong to the extent that we ought to ignore it. What's your response to her claim that it was misinterpreted? Yes, I think Professor Boyd is incorrect about that. It is the duty of the district court to not necessarily simply consider the methods which have been used, but the notion of discoverable and manageable standards may include the possibility of prospectively inventing a scheme for managing the case. It does not require that a similar case has been managed in the past. She wasn't really making that argument as her first line. She said that the difficulty is before you get to that argument, that as a matter of law, the district court misinterpreted prong two at odds with Northrop. In other words, that it's not really kind of a class action, is it too big for the courthouse Greg box, but it's a question of whether the standards one would need to use to put the case through would implicate a political or executive or legislative branch issue. Well, I think if one reviews the panoply of cases which have addressed the political question doctrine, they look to the nature and complexity and difficulty of handling fairly the case. And here, taking the complaint as true, that poses a significant problem, not only for the reasons cited by Your Honor, but also because we're talking about, unlike the ultimate case, we're talking about property that clearly, by the terms of the complaint itself, can no longer be identified, and property which, by the terms of the complaint itself, passed into this alleged treasury was mixed with other property and then in some portion passed out and apparently, according to the complaint, went somewhere into Rome, possibly into the Vatican Bank. Well, if it's money, it doesn't matter if it goes in, out, or whatever. Money is traceable, is it not? Or fungible, maybe. Fungible. You don't need to follow the same Deutschmark or whatever they used back then or in Croatia or whatever. There's a quite significant difference between each of the cases which has carved out an exception based upon identifiable property in this case. In each of those cases, there is a specific knowledge of who took the property, who may have the property, its transmutation, and it does not pass through multiple hands, multiple treasuries, and there isn't uncertainty as to how it's taken. If we go back to the Bernstein case or the Bodner case or the Altman case, these are extremely narrow exceptions to the notion that losses which occur during the chaos of war need to be handled by the states of the nationals who suffered the loss. And this is the fundamental difference, I think, between the position of appellants and the IOR. Let me try to focus your response. Professor Boyd referenced the Northrop case, the Ninth Circuit case. I was talking about a D.C. Circuit case. Judge McKeown has asked you again about the Northrop case. In your view, what does the Northrop case stand for? Quite honestly, Your Honor, I can't respond specifically on that point with respect to the Northrop case. You're not familiar with the case? I don't recall the specific language of the case with respect to that point. I do recall the discussions of manageability in the Holocaust cases, which have each taken a position that the lack of capacity of a district court, for example, to issue discovery on foreign sovereigns, collect the evidence necessary to reach a fair conclusion, and in this case, I think most importantly, to adjudicate claims of various successor states to the state of Yugoslavia, which is one of the things that would have to happen here clearly, is well beyond the province of a district court to manage. As you know, and is remarked in the 767 Third Avenue case, which deals specifically with Yugoslavia, the history of that country is that after World War I, it was formed. It broke up prior to during World War II. There was a successor state then after the breakup of a new Yugoslavia. After that, it broke up again in the early 1990s. What's troubling me is that prong two, to the extent it looks at things that we would look at in determining whether it was a class action, seems like a predetermination without the evidence, because we can pick out some things that are problematic. But in your view, how does prong two relate to the kinds of things that later on, one would just sit down as a district judge and decide this is out, this is in, this is the class, this is out because of the lack of jurisdiction or FSIA or whatever. I mean, all those kind of go to the merits, and then pretty soon this thing shrinks probably. Why wouldn't we let it go to that phase, because we have pretty sophisticated district judges that have pretty sophisticated tools for resolving huge cases. The manageability in these cases is different from the manageability of domestic cases or even the manageability of some worldwide class action. And that is definitely an important point. Counsel then says, well, what about the Swiss bank cases or the German? We seem to be going along just fine resolving those in the federal courts. What's your response to that? The response is that there are two responses. First of all, because they are settlement cases, they're an agreed set of standards, which include relaxed standards of proof, have been arrived at. Expand that. I want to make sure I completely understand. You say they are settlement cases. Yes. What does that mean? Actions were brought. They were each putative class actions. There was no class certification. These cases were each settled prior to the creation of either the German foundation or the Austrian foundation. The terms of the settlements call for relaxed standards of proof and providing evidence of a claim. Counsel, we have that all the time in class actions in the district courts. We have certification of settlement classes. Indeed, that's the usual fate. When we have class actions that are contended on their face to be unmanageable, somehow district judges manage to cut the Gordian knot, and the parties then enter into the kind of thing you've described, and it then takes the form of certification of the settlement class. Is that a basis for cutting this one off at the pass? I think it is here, Your Honor, because administration of this case or getting to the merits, first of all, of this case, such that an administration would take place, would require the gathering of evidence from multiple countries, evidence over 50 years old, and intrusions upon various sovereign archives. Let's go back on the German and Swiss cases. Did those survive political question dismissal motions? No. So, in other words, the case was filed, things came to a halt, then they went out and worked out a settlement and came back? That's essentially correct. When former Undersecretary Eisenstadt talks about the catalyst, the lawsuit was the catalyst for the settlement. That is correct. That is Plankett's position. I must say that to divine the precise relationship between these cases and foreign policy or to assert that in some way the filing of these cases should form a prong of American foreign policy is precisely what the political question doctrine stands against. The political doctrine- The short answer is there was no political question decision in those cases. The political question dismissal motions were pending. The fairness hearings, in particular Judge Corman's comments in the fairness hearings, noted that he found fairness in the settlement precisely because of the weight and non-frivolous nature of the political question motions to dismiss before the court. Maybe this is way too simplistic, but if we have a couple of situations in which cases like this are proceeding without too much trouble in district court, then why does it suggest that these cases necessarily lack judicially discoverable or manageable standards? Your Honor, there are no cases like this proceeding. There are cases which have settled under guidelines calling for relaxed standards of evidence. This one will settle. That's the point. In other words, it will come to a halt. It will go out. They'll carve it up. It will settle. It will come back, and the district judge can do what the judge in New York. That is not part of the political question inquiry, and that's the fundamental answer to that question. No, but lack of judicially discoverable and manageable standards is, and it just seems to strike me that if two cases that fall generally within this category, under the aegis of the district court have become settlement cases and made themselves amenable to district court treatment, then why is this different? The fact that defendants consented to have the cases and the claims administered by the district court in no way, I would urge, should affect this court's determination as to whether these claims, which are particularly tenuous if one reviews carefully the allegations of the complaint, affect this court's ability to handle such claims moreover. What would happen if we disagreed with you and said that the district court was wrong on the analysis of prong two but hypothetically was correct on prong one? Would we have to send it back? Certainly not, because prong one is sufficient. Any one of the six is sufficient for dismissal on a political question ground, and we do have here a significant overlap of the two prongs, because the question of manageability to the extent that it relates to the opening of archives goes directly to one of the foreign policy initiatives announced in the Eisenstadt report at the beginning of that report, page one forward, which is attached to our brief, points out something very specific. The United States supports a foreign policy initiative to come to a historical reckoning as the truth and to see some restitution done. Plaintiffs have conceded there is no treaty covering this matter. And it says so, doesn't that cut the other way? Because, you know, in other cases, the other branches, and when we talk about political question we're talking about our tripartite governmental system,  as I understand this case, exactly the opposite has taken place. Doesn't that educate us somewhat on the question of whether the judicial branch should be entering this area? I think the answer is decidedly no for a couple of reasons. First of all, it's in the nature of foreign policy that what goes on in the conduct of foreign policy is not all known to the public. Therefore, for this court to use what is in the public domain as some sort of a litmus test as whether or not there is a foreign policy interest in this area would be mistaken. That's the first point. The second point is, in fact, we do have evidence in this case of a foreign policy interest in the area. And I can call to the court's attention, because this was of particular interest to me, and I had been thinking about it in preparing for hearing in the last couple of days. Plaintiff's position is, well, the Eisenstadt report clearly does take some interest in it. A point made by the district court, they talk about the Vatican, they talk about Croatia, they talk about the need to resolve these claims, and they call them diplomatic efforts. So with respect to this issue, the executive has occupied specifically this area. Plaintiffs have suggested in their papers that that ceased at some point and that this court should be looking to the State Department all the time to see whether or not, possibly from administration to administration, there's a foreign policy initiative in a particular area. That approach is mistaken because it requires that the court look to the public domain as to whether or not foreign policy initiatives are being conducted. Now, in this case, I have found evidence, if the court wishes to receive it, in the form of a letter dated, I believe, June 16, 2002, issued by the State Department, stating specifically that it has a continuing interest in. Is that in the record? No, it is not in the record. Have you moved to supplement the record? No, I have not moved to supplement the record. It seemed to me responsive, though. I located the document. It does suggest that there is a continuing, more than suggests, it states specifically that the State Department favors resolution of these claims, is working on a government-to-government basis, and this relates specifically to the claims in what is now Serbia and Croatia. Another point in this regard, which to my mind is extremely important. If the executive determines that it is not going to pursue, at some point, a diplomatic initiative, that does not remove it from the realm of diplomacy. For example, in the Yugoslav case, in the case of the Balkans, there are many, many urgent problems there which are in need of resolution. Whether or not, right now, the State Department is holding an abeyance resolution of these matters, does not mean it is not a matter for the State Department to handle. That is very important. The capacity of the, it is precisely the openness and lack of resolution in this case, which militates for this court's decision that this is a political question case. The lack of closure is what makes this a political question. The lack of a treaty, if this had somehow been covered by a treaty and there were substantive rules of decision. You would be making the same argument, wouldn't you? Excuse me? I say you would be making the same argument, only this time you would say, well, the presence of a treaty is the thing that controls. In the hierarchy of decision, if there is a treaty that may control, and that treaty is brought to the attention of the court, and the treaty does cover, that may take it out of the realm of the political question doctrine because it is covered by a treaty. Now, in this case, treaties have been offered by the parties both below and here to indicate that these are the kinds of claims, that is, reparations, which are generally handled by state-to-state negotiations. And that is the point of the treaties here. It's not just a question of is it handled by a treaty or is it not handled by a treaty, and this is part of the Deutsch lower court, appellate court confusion. But that treaties are evidence of the kinds of claims which are handled by the executive, and therefore before coverage by a treaty are political questions. For the court to insert itself into this process, and the example of the difficulties in the Balkans is a prime example, is to unwittingly go where the foreign policy power of the United States is maneuvering, is making initiatives, it's not clear at all that we need to know what the State Department is doing in order to make a determination that this is a political question. Your time has run. Is there any other point you feel compelled to make? There are numerous points. If I could be allowed three more minutes, I will try to make them. May I? Please go ahead. Thank you. We'll give the other side more time, so it's only fair I give you the same amount of time. Much appreciated. First of all, I would cite to the court the 767 Park case related to the issue of successor states which is an extremely important case in this regard. Also, the question of the fact that this defendant is the instrumentality of a foreign sovereign, according to the Wang Jim Ju case, militates more for application of the political question doctrine to this defendant. That's the same holding, a similar holding to both the Cannes case and the 767 Park case. With respect to cases like Cooey, Cooey is representative of a number of cases cited by plaintiffs for support of the position that this case is manageable. And it's a perfect example of a case which is not on all fours. It occurred recently, similar to the Marcos cases. Occurred recently was a discrete act. Damages are clear. Who suffered the damages and who caused the damage are all very clear in that case. Also, with respect to the statement of interest issue, statements of interest are coming out in these cases all the time now simply because that is part of the foundation agreement negotiated between President Clinton and the German Chancellor at that time. There was an agreement that the United States duty would be discharged in those cases by filing statements of interest. Kelbrine, Berger-Fisher, Iwanoa, other important cases, there was no statement of interest. That is not a litmus test for whether the political question doctrine should apply. Indeed, the State Department may have its own reasons for in some cases submitting a statement of interest and in others not. That is not this court's question. Let me go back here very quickly. I must take issue with the notion that there is some special evidentiary burden on defendants in this case. I don't find that in the cases. It appears that normally operable in the cases is some combination of taking the facts in the complaint as true with some judicial notice of documents outside or facts outside relevant to the proceedings, possibly treaties, and then the court reaching a conclusion without applying a particular burden to one or another. However, in the Ninth Circuit, for example, where under the Cooey case, the political question doctrine is viewed as a question of subject matter jurisdiction rather than a mere ousting of subject matter jurisdiction, normally subject matter jurisdiction requires a burden of a showing on plaintiffs, not defendants. I think that the burden certainly doesn't fall on us. With respect to the Tate letter, I would only urge that you take a look at the Bernstein case, where it is reprinted most fully. I actually could not find a copy of the original. I looked for it. That relates to very specifically identifiable property, and these are the only exceptions. This is the only principle which accepts the rule that reparations claims belong to the state of the national who has suffered the damage, precisely the holding of Berger Fisher and Iowanoa. Go through. Thank you, counsel. Thank you, sir. Thank you, sir. Professor Boyd, or who's going to? Good morning, Your Honor. My name is Paul Vallone. And I represent the appellee, the Order of Friars Minor. Our position is basically the same as my colleague's position. I would just like to bring it down to a more fundamental level and focus on the first prong of the Baker factors, which the courts have held to be the most important factor. And in any event, if any one of the factors, one of the six factors— I understand that. Okay. The first prong of the Baker test asks whether there has been textually demonstrable commitment of the issue to the political branches of the government. This prong of Baker has its roots in fundamental principles of separation of powers as set forth in the United States Constitution. As relevant here, provisions of Articles 1 and 2 give the political branches the power to make war and determine the terms of its resolution. The courts have interpreted these powers as specifically including the power to settle wartime claims as expressed by the United States Supreme Court in Garamendi and other cases such as the Deutsch case, which is a Ninth Circuit case. The record before this court and the controlling case law cited in the appellee's briefs establish that the political branches of the United States government have been actively involved in addressing reparations issues involving Holocaust victims' claims and that those efforts are ongoing. This is reflected in part in the Eisenstadt Report, which has been discussed in fairly great detail, the London Conference on Nazi Gold, the 1998 Washington Conference on Holocaust-Era Assets, as well as several numerous other treaties and executive agreements entered into among the United States and other countries after World War II. These judicially noticeable facts and legal authority cited in the appellee's briefs establish, in our opinion, as a matter of law, that there exists a textually demonstrable commitment of this country's political branches to address and resolve Holocaust victim claims. I did have one question on that. That is, we are dealing, are we not, in political question with a jurisdictional issue, right? Subject matter jurisdiction, right? Isn't that how it's treated? Just a stability issue. I don't know if that's the same as... Yeah, jurisdictional issue. And if so, you know, I was reading through the Supreme Court's decision in the Altman case, Republic of Austria against Altman, and I noted that the court really did not talk at all about that as a threshold issue, and to my knowledge they've never been very bashful about ducking jurisdictional issues. Is there any significance to be considered possibly attached to that? In my opinion, Your Honors, no. Cases are not authority for a proposition not cited therein. Altman did not... So the court takes on an issue of the merits even though there's a subject matter jurisdictional defect? The Supreme Court does that? Say that again. Excuse me, Your Honor. I say does the Supreme Court then take on merits issues if there's a subject matter jurisdictional flaw that would preclude that being done? I don't know how to respond to that question. Okay. Sorry, go ahead. Does the Supreme Court decide matters that are not justiciable? No. Thank you for clarifying. Well, in that case, it would seem that Altman, if that's your position, it would seem that in Altman that there was some substantial agreement among the court that they had jurisdiction and that there was no political question bar then, correct? Because it was justiciable. I'm sorry. I say because it was justiciable. Yeah. My response to that is that as this court has already announced, as we have cited in our brief, the Altman case is an aberration in my opinion because it involved six paintings, identifiable property. Again, a specific identifiable property as opposed to the allegations of the incident complaint, which I will quote one allegation. Maybe what we ought to do is take the Supreme Court at its word. In 1925, it said that questions that are merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered to have been decided and do not constitute precedent. The old lurk in the record. Lurking doctrine. Isn't that really the answer to why the Supreme Court blew by the political question issue? Our interpreter can get lurk in the record. That could be, Your Honor. But the Supreme Court has also said in Gaines and Moore v. Reagan, a 1981 case, and I quote, the issue of restitution for Nazi crimes has in fact been addressed in the executive branch diplomacy and formalized in treaties and executive agreements over the last half century, end quote. Do you have anything in addition to that? No, Your Honor. I will submit. Thank you very much. We'll give the other side two minutes. Should the other side care to take advantage of it? Please make your Northrop point again. The Northrop case seems to escape the other side. Exactly what do you think the Northrop case requires us to do? The Northrop court case sets forth the second prong analysis in the Baker analysis of judicially manageable standards and describes it as an inquiry into the nature of the claims before the court, whether or not they will be a challenge to the wisdom of any governmental decision. Will the adjudication impede upon some policy decision? That is a standard that is reiterated in the Japan whaling case in the Supreme Court. In which case? Japan whaling. Oh, the Japan whaling. In Japan whaling, the court stated that controversies that resolve around policy choices and value determinations committed for resolution to the halls of Congress or the confines of the executive branch are political questions. However, the judiciary is suited for cases that are legal in nature, that have legal standards to apply to them. So in this case, the manageability issue, which is better left to the district court under Rule 23 standards, 12b6 standards that counsel has addressed, is not the relevant inquiry under the Northrop Ninth Circuit precedent or the Supreme Court precedent, which requires an analysis of the type of inquiry before the court. Here, the expropriation claims of funds looted, regardless of whether they are a painting or some identifiable property in that sense, have manageable standards that the courts have used in a variety of cases adjudicating similar torts. Specifically, the cases of the Swiss banks, where 4.1 million claims are being adjudicated currently. In the Bodner case with the French banks, millions of claims are being judicially managed at this point, pursuant to the settlement agreement, but also being reviewed continually by the courts under the settlement agreement. And in response to counsel's distinction between this case and the settlement case, that is irrelevant to the question of political question doctrine. The vast majority of cases before these courts are quote-unquote settlement cases. They still, under the Amchem precedent, must be reviewed, large class actions, with specific legal standards that address the questions under manageability whether that's a superior method or not, and do take into account factual issues that are better left to the district courts where they can apply the standards they have. They are not the precise inquiry of the political question doctrine under the precedent of the Supreme Court and the Ninth Circuit. You have about 30 seconds. In sum, the three branches from the evidence in the record have marched in tandem in the overriding policy to compensate the victims through judicial means as well as diplomatic and congressional means that have specifically addressed the claims before the courts. There is no evidence here that any policy determination must be reviewed, and accordingly, Article III subject matter jurisdiction that exists in this case should be exercised. Thank you for your time. Thank you, counsel. We thank our delegation from China. We hope this has been an interesting proceeding. The case is complex, complicated, and difficult. For your benefit, the three of us later on today will sit down, discuss the case, try to decide it, and eventually we'll send a written decision to the parties telling them what it is. And we wish you all the best on your stay in the United States. This case, just argued, is ordered submitted and will take a five-minute recess in order for the courtroom to readjust.
judges: Trott, McKeown, Shadur